**JOHN J. ZIDZIUNAS & ASSOCIATES, LLC**
**JOHN J. ZIDZIUNAS, ESQ, N.Y. ID: 5544044**
**33 PLYMOUTH STREET, SUITE 202A**
**MONTCLAIR, NEW JERSEY 07042**
**Phone: (973) 509-8500**
**Fax: (973) 509-1770**
**ATTORNEYS FOR PLAINTIFF, MARIELE DIMAURO**

**NY OFFICE:**
**14 MURRAY STREET, SUITE 235**
**NEW YORK, NY 10007**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **MARIELE DIMAURO,**<br><br>     **PLAINTIFF,**<br><br>**VS.**<br><br>**189 CHRYSTIE STREET PARTNERS, LP (d/b/a "The Box NYC"); VARIETY WORLDWIDE, LLC; SIMON HAMMERSTEIN (in his individual and professional capacities); JAVIER VIVAS (in his individual and professional capacities); JOHN DOES 1-10, and XYZ CORPS. 1-10,**<br><br>     **DEFENDANTS.** | **____CV_____**<br><br>**COMPLAINT AND**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Mariele DiMauro ("Plaintiff"), by and through her attorneys, alleges the following upon her knowledge and belief, as against the Defendants 189 Chrystie Street Partners, LP (d/b/a "The Box"), Variety Worldwide, LLC ("VWW"), Simon Hammerstein ("Hammerstein," in his individual and professional capacities), Javier Vivas ("Vivas," in his individual and professional capacities), John Does 1-10, and XYZ Corps. 1-10 (collectively the "Defendants" or "The Box"):

## I.  Nature of Action, Jurisdiction, and Venue

1.      This is an action seeking equitable and legal relief for violation of: the Fair Labor Standards Act of 1938, 29 U.S.C. §§ 201-19 ("FLSA") (Counts I, II & III); the New York Human Rights Law, NYCHRL § 8-107 – Unlawful Discriminatory Practices based on Sex and Gender (Count IV); the New York Hospitality Wage Order, NYCRR §146  - 1.3, - 1.8, and - 1.5 (Counts V, VI, & VII), New York Labor Law §§ 190-99A and §§ 650-65 ("NYLL") and the regulations promulgated by the New York Department of Labor (Counts VIII, IX, X, XI, XII, & XIII); Section 7434 of the Internal Revenue Code ("IRC") 26 U.S.C. § 7434 (Count XIV); Breach of the Implied Covenant of Good Faith and Fair Dealing (Count XV); Breach of Contract (Count XVI); Common Law Fraud in the Inducement (Count XVII); Common Law Fraudulent Misrepresentation (Count XVIII); and Constructive Discharge (Count XIX).  Plaintiff seeks redress for damages, liquidated damages, statutory damages, pre-judgment interest, post-judgment interest, attorneys' fees and costs.

2.      The Court has subject matter jurisdiction over Plaintiff's FLSA and IRC claims pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 216(b) and supplemental jurisdiction over Plaintiff's NYLL and Hospitality Wage Order claims, NYCHRL and common law contract and fraud claims pursuant to 28 U.S.C. § 1367(a).

3.      Venue is proper in this District under 28 U.S.C. § 1391(b) and (c) because all, or a substantial portion of, the events or omissions giving rise to the claims occurred in this District, Defendants maintain their corporate headquarters and offices within this District, Defendants operate their business in this District, and Defendants employed Plaintiff in this District.

## II. Parties

### Plaintiff Mariele DiMauro

4.      Plaintiff, Mariele DiMauro, ("Plaintiff" or "Ms. DiMauro") resides in New York County, New York.

5.      From approximately September 2017 until January 2020, and at all times relevant to this Complaint, Plaintiff was employed by 189 Chrystie Street Partners, LP (d/b/a

"The Box") as a waitress and "service employee" as the term is defined in New York Hospitality Industry Wage Order §146 – 1.3.

6.    189 Chrystie Street Partners, LP owns the physical event space known as "The Box" at 189 Chrystie Street, New York, New York, 10002. The space is a 7,000 square foot, three-level building which includes a reception foyer and two floors and can accommodate nearly 300 guests at one time. The Box is a "full service production facility" which provides "specifically tailored…entertainment…from a single performance to a full length show" which, upon information and belief, immerses all employees of the Box in each performance.

7.    In fact, at all times relevant to this Complaint, the Box has proclaimed itself to be "Theatre of Varieties," and has identified the Plaintiff as part of its "Cast." (See http://www.theboxnyc.com.)

8.    As a waitress/service employee at the Box, Plaintiff handled and dispensed alcoholic beverages, received payment for the alcoholic beverages, handled containers that had held alcoholic beverages, handled and dispensed food, and received payment for food consumed on the premises of The Box.

9.    Plaintiff was also required to don specific makeup, dress in themed costumes, and "act" along with stage performers at The Box, as explained further below.

10.   Plaintiff is a covered employee within the meaning of the FLSA and the NYLL.


**Defendants and Defendants' Employees, Servants & Agents**

11.   189 Chrystie Street Partners LP (d/b/a "The Box") is a Limited Partnership, incorporated in the State of New York on November 16, 2004.

12.   Variety Worldwide, LLC ("VWW") is a leading global entertainment and hospitality management company which registered as a corporation with the New York Department of State on April 16, 2013, and which maintains an address for the purposes of service at 80 State Street, Albany, New York, 12207-2543.

13.   Defendant, Simon Hammerstein ("Hammerstein") is Co-Owner and "Proprietor" of The Box, and a founding partner of VWW.

14.    Defendant Javier Vivas ("Vivas") is General Manager of The Box and Chief Operating Officer of VWW.

15.    Defendants 189 Chrystie Street Partners, LP and Variety Worldwide, LLC constitute a single employer of Plaintiff under the FLSA and NYLL due to the: (i) interrelation of operations; (ii) centralized control of labor relations; (iii) common management; and (iv) common ownership and financial control exhibited by these corporate Defendants.

16.    As a single employer, these corporate Defendants had and did in fact exercise, among other things, the power to: (i) hire and fire Plaintiff, as well as threaten to fire the Plaintiff if she failed to perform additional unpaid services for the benefit of the corporate Defendants; (ii) supervise and control the Plaintiff's work schedules, as well as the terms and conditions of her employment; (iii) determine the Plaintiff's rate and method of payment, including how tips were taken from Plaintiff and distributed; (iv) maintain Plaintiff's employment records including hours of work, tips, and sales, as well as information related to Plaintiff's federal and state tax forms; and (v) ultimately create an unbearably toxic workplace in which the Plaintiff was no longer able to remain employed.

17.    Hammerstein and Vivas were also the employers of Plaintiff because these individual Defendants had and did in fact exercise, among other things, the power to: (i) hire and fire Plaintiff, as well as threaten to fire the Plaintiff if she failed to perform additional unpaid services for the benefit of the individual Defendants; (ii) supervise and control the Plaintiff's work schedules, as well as the terms and conditions of her employment; (iii) determine the Plaintiff's rate and method of payment, including how tips were taken from Plaintiff and distributed; (iv) maintain Plaintiff's employment records including hours of work, tips, and sales, as well as information related to Plaintiff's federal and state tax forms; and (v) ultimately create an unbearably toxic workplace in which the Plaintiff was no longer able to remain employed.

18.    During the relevant time period, John Does 1-10 are currently-unknown employees/agents/workers/contractors who were employed by Defendants, or

4

who were either senior management level employees who controlled Plaintiff's workplace, aided and/or abetted in the commission of conduct complained of herein and/or acted within the scope of their employment at the workplace site during working hours, or, to the extent they went beyond the scope of their employment, ratified, embraced and added to the Defendants' misconduct. As the parties engage in discovery, Plaintiff retains the right to amend the Complaint to add these individuals by name.

19.   During the relevant time period, XYZ Corps. 1-10 are unknown unaffiliated corporations or entities or other corporations or entities connected to the named corporate Defendants who have liability for the claims set forth herein. As the parties engage in discovery, Plaintiff retains the right to amend the Complaint to add these corporation or entities by name.

20.   In sum, the Defendants had the power to control the terms and conditions of Plaintiff's employment as alleged in this Complaint and, in fact, exercised such power, harming the Plaintiff and violating the law.

21.   Thus, all Defendants are subject to suit under the statutes alleged herein.

### III. Factual Allegations

**Minimum Wage & Wage Payment Violations at The Box**

22.   Plaintiff is a 28-year-old female who was employed by the Defendants from September 2017 until her constructive termination in January 2020.

23.   At all times relevant to this Complaint, Plaintiff was hired as and worked as a waitress and "service employee" within the meaning of New York Hospitality Industry Wage Order §146 – 1.3.

24.   At the time Plaintiff was hired, she was advised by Defendant Vivas that her rate of pay would be the minimum wage, plus her tips.

25.   In fact, The Box's website, which includes sections for "Jobs" and "Auditions," unequivocally states: "[A]ll service team members are paid a direct wage that is at least equal to the minimum wage." (See http://www.theboxnyc.com).

5

26.   At the time of her hire in 2017, the minimum wage for service employees, such as Plaintiff, was $9.15 an hour, with a $1.85 per hour tip credit.

27.   However, despite the legally-mandated minimum wage in the State of New York, Plaintiff was actually paid $8.75 an hour at the time of her hire and for the duration of 2017.

28.   From December 31, 2017 through December 31, 2018, the minimum wage for service employees, such as Plaintiff, was $10.85 an hour, with a $2.15 per hour tip credit.

29.   However, despite the legally-mandated minimum wage in the State of New York in 2018, Plaintiff was actually paid $8.75 an hour during 2018.

30.   From December 31, 2018 through December 31, 2019, the minimum wage for service employees, such as Plaintiff, was $12.50 an hour, with a $2.50 per hour tip credit.

31.   However, despite the legally-mandated minimum wage in the State of New York in 2019, Plaintiff was actually paid $8.75 an hour during 2019 until November 22, 2019.

32.   Plaintiff's W-2 forms and pay stubs further demonstrate her improper wages during her employment.

33.   *As evidenced herein, Defendants committed these wage payment and minimum wage violations (in violation of both New York and federal law) knowingly, intentionally and deliberately*.

34.   On November 22, 2019, the Defendants decided to increase Plaintiff's wages, however, the Plaintiff's wages continued to be below the legally-mandated minimum wage, representing a willful, deliberate and illegal denial of proper wages by Defendants.

35.   In fact, as Plaintiff would learn from the statements of Defendant Vivas in a group meeting, Defendants had been 'dipping into' Plaintiff's tips and other service employees' tips at The Box in order to meet the increasing minimum wage requirements for other non-tipped workers, keep The Box "sustainable," and avoid

prosecution by state and federal regulatory agencies for underpaying these other workers.

36.  Such a practice was deceitful to the Plaintiff, other service employees, and patrons, and represented a  willful, deliberate, and illegal misappropriation of the Plaintiff's tip monies by the Defendants.


**Illegal Conduct Pervasive inside the Workplace**

37.  Although Plaintiff had initially been excited by the prospect of working for such a trendy, famous and edgy establishment as The Box, she began to realize soon after she was hired that things at The Box were amiss.

38.  For example, Defendant Hammerstein would frequent The Box and try to get the waitresses to do drugs with him, such as cocaine, and take shots of alcohol.

39.  This conduct was directly witnessed by numerous employees of The Box, including the Plaintiff herself.

40.  Although Hammerstein was the owner of The Box, Plaintiff was required to treat him like a patron and could not avoid serving his table.

41.  Additionally, Defendant Vivas, who was The Box's General Manager, would always illegally smoke inside of the establishment, making working conditions unbearable for Plaintiff and other service employees in a closed door space.

42.  Plaintiff often complained to the floor managers that the cigarette smoke upstairs was harming her health, as well as being against state and local laws.

43.  Additionally, the use of cocaine and illegal narcotics by patrons of The Box was flagrant and not addressed by The Box's management, despite pleas from the Plaintiff and other waitresses about how it affected working conditions.

44.  The Plaintiff was routinely forced to humiliate and objectify herself for The Box's often belligerent, unregulated clientele, all for tip monies which she later learned were being misappropriated on the arbitrary whims of the Defendants.

45.  In addition to the smoke, drugs, intoxication and general unchecked misconduct of the Defendants and The Box's patrons, Plaintiff also complained about the lack of security on the upstairs level, where she would often have to deal with unruly

patrons alone until she could make her way downstairs to find a doorman to help her. Plaintiff would complain to floor managers as well as to Defendants during staff meetings that she did not feel safe under these working conditions.

46.   Whenever Plaintiff complained about these issues, they were not addressed.

47.   Because her complaints were consistently ignored, Plaintiff eventually stopped complaining about the illegal activities of the Defendants, even as the activities began to multiply and conditions became more unbearable.

48.   Additionally, Plaintiff later learned that The Box allegedly did not have a dance permit, even though she was required along with the other waitresses to encourage patrons of The Box to get up and dance.

49.   Plaintiff and the other waitresses would also be required by Defendants to get up on stage after 4:00 a.m., when The Box was supposed to be closed by law, to 'keep the party going' so that patrons would not leave and would keep spending more money.

50.   Plaintiff was also encouraged to serve patrons more alcohol, over her objections to do so, even when the patrons appeared intoxicated, and even after she brought this to the attention of the Defendants.

51.   Defendants would also force Plaintiff and the other waitresses to solicit patrons to buy liquor and to would sell liquor to patrons past 4:00 a.m., which is illegal under the New York State Liquor Authority Law.

52.   In addition to these improper working conditions, Plaintiff also soon realized that she was not getting paid "the minimum wage, plus her tips" that she had been promised when she accepted employment with The Box.

## Illegal Tip Pooling by The Box & Sex Discrimination

53.   In 2011 New York's Department of Labor ("DOL") enacted the Hospitality Industry Wage Order ("HIWO"), which requires that employees eligible to participate in a tip pool "must perform, or assist in performing, personal service to patrons at a level that is a principal and regular part of their duties and is not merely occasional or incidental" and that only "food service workers may receive distributions from the tip pool."

8

54.   Food service workers" are defined as "any employee who is primarily engaged in the serving of food or beverages to guests, patrons or customers in the hospitality industry, including, but not limited to, wait staff, bartenders, captains and bussing personnel; and who regularly receive tips from such guests, patrons or customers."

55.   On Plaintiff's first day, she learned that she would have to "tip pool" with other employees not legally eligible to participate in the tip pool, including the doormen, the hostesses, the bartenders, the barbacks and the busboys.

56.   This meant that the Plaintiff – as well as all of her all female waitress counterparts - would have to share her tips with other employees of The Box, many of whom already made their own tips, which, unbelievably, they were not required to share back.

57.   In fact, the waitresses of The Box, who were, at all times relevant to this Complaint all female, were the *only group of employees* who were required to pool their tips with the other Box employees, who were all or mostly male.

58.   For example, from the time the Plaintiff was hired until September 2019, the bartenders all made their own tips but did not have to pool their tips with rest of the employees. However, the bartenders received a share of the waitresses' tip monies during this period.

59.   In or around October 2019, Plaintiff learned that Defendants were changing the tip pooling scheme.

60.   Now, the bartenders would no longer receive shares from waitresses' tips. However, Defendants illegally expanded the group of workers who received the waitresses' tips to include the *coat check staff, bathroom attendants, kitchen personnel, and ushers*.

61.   Further, the all-female waitresses also continued to be required to share their tips with the *doormen, hostesses, barbacks and busboys*.

62.   The net effect of the October 2019 change was an *even more unconscionable, even more discriminatory imbalance of tip pooling flowing in only one direction*, from the Plaintiff and other similarly-situated waitresses, who were all

female, to other Box employees, who were either all male or were predominantly male.

63. Remarkably, Defendants made no effort to hide their motives for the October 2019 tip pooling changeup, stating cavalierly to the Plaintiff and the other waitresses in a team meeting that the only reason the bartenders no longer shared in the waitresses' tips was because the minimum wage was increasing and other employees would be given a portion of the waitresses' tips to increase their wages, so The Box could avoid prosecution from state and federal regulatory authorities.

64. The Defendants were also unequivocally clear during the meeting that they did not want the increased minimum wage to come from their own pockets, and that they would fill all pay gaps with tips taken from the waitresses.

65. The Defendants further vocalized at the meeting that if Plaintiff and the other waitresses did not like the practices of The Box, which included being paid less than minimum wage and having to illegally share their tips, they would be terminated.

66. Throughout the October meeting, Plaintiff and other service employees raised questions about the Defendants' practices, to which Defendant Vivas responded repeatedly in a demeaning, condescending, dismissive and threatening tone, furthering the toxic culture of The Box.

67. Knowing that Defendants would eventually deny their illegal practices and the threats, Plaintiff took precautions to digitally record statements Defendant Vivas and other Defendants made to employees.

68. Again, the waitresses, who were at all times relevant, all female, were the ***only group of service employees*** who were required to pool their tips with the other Box employees.

69. In total, Plaintiff was required to relinquish ***60% or more of her earned tips through the illegal tip-pooling structure***.

70. As a result of the tip pooling structure, Plaintiff calculates her losses from tips alone to be at least $14,000 during 2017, which W2s and Pay Stubs will further show.

10

71.   As a result of the tip pooling structure, Plaintiff calculates her losses from tips alone to be at least $36,000 during 2018, which W2s and Pay Stubs will further show.

72.   As a result of the tip pooling structure, Plaintiff calculates her losses from tips alone to be at least $19,000 during 2019, which W2s and Pay Stubs will further show.

73.   Whenever Plaintiff complained about the illegal tip pooling scheme, she was advised by Defendant Vivas that "if you don't like it you can leave" and to "go back to school."

74.   This was commonly Defendant Vivas' response to his employees' attempts to receive fair pay, as the recordings captured by the Plaintiff will demonstrate.

**Unpaid Work for Being "On Call"**

75.   Although a full shift was considered 11:00 p.m. to 4:00 a.m., Plaintiff was actually required to be "ready" and "on the floor" at 10:45 p.m., for pre-shift meetings.

76.   These fifteen (15) minute pre-shift meetings were unpaid.

77.   Plaintiff would also arrive even earlier to work by 10:30 p.m., prior to every shift, to comply with Defendants' extensive wardrobe and makeup demands.

78.   Defendants did not pay Plaintiff for her time spent getting ready for work (including the donning of costumes or uniforms and the putting on of makeup).

79.   Additionally, Plaintiff was required to come in at 10:00 p.m. for her weekend shifts (at least once per week) to "set up" The Box. This included moving and organizing tables and chairs, dressing tables with linens, and placing flowers and candles on the tables.

80.   For this thirty (30) minute period every weekend shift, Plaintiff was unpaid.

81.   Further, waitresses were expected to purchase their own costumes for work and don makeup for themed events, like "Nightwatch: The Box Beach Party," "Satan's Casino," Wild Wild Wednesday" and "Camp Beaverton" even though the clothing and makeup required to be worn by waitresses changed frequently, depending on the theme of any given night's events.

82.   Accordingly, Plaintiff has spent countless sums of money on clothing and makeup that was required by the Defendants to create a "look" which included exploiting

11

an objectifying the Plaintiff and other waitresses for tips which they were ultimately denied.

83.  Defendants did not pay Plaintiff for her time spent tracking down the right clothing and makeup for the ever-changing "look" mandated by the Defendants in routine emails, which Plaintiff has maintained copies of and further discovery will show.

84.  Defendants did not reimburse Plaintiff for the clothing and makeup purchases they required to work at The Box, in violation of New York Labor Laws.

85.  Plaintiff was also required to attend sponsored events, such as events sponsored by champagne company Veuve Clicquot.

86.  Despite being unpaid, these appearances by The Box waitresses were mandated. Plaintiff and the other waitresses were "punished" if they were unwilling or unable to be put on display at events – either by not being scheduled for the upcoming work period, being scheduled for "on-call" shifts only, being scheduled for unwanted/undesirable shifts, or being threatened with termination.

87.  At all times relevant to this Complaint, Plaintiff was also required to attend team meetings at least once per month.

88.  These meetings usually lasted around an hour and were never paid.

89.  However, despite not being paid to attend these meetings, the meetings were mandatory.

90.  Indeed, waitresses were punished if they were unwilling or unable to attend meetings – either by not being scheduled for the upcoming work period, being scheduled for "on-call" shifts only, being scheduled for unwanted/undesirable shifts, or being threatened with termination.

91.  Further, Plaintiff was frequently required to attend tastings and trainings for certain types of alcohol, such as Moet and Hennessey.

92.  Like meetings, these trainings were mandatory and were never paid.

93.  Again, the Plaintiff and other waitresses were punished if they were unwilling or unable to attend tastings – either by not being scheduled for the upcoming work period, being scheduled for "on-call" shifts only, being scheduled for unwanted/undesirable shifts, or being threatened with termination.

94.  Waitresses were also punished by the Defendants if they failed to be "on call" or on "stand by" whenever ordered by the Defendants.

95.  Defendants stated to Plaintiff that if "on call," she was required to immediately report to work at any point in the evening up until 12:00 a.m.

96.  Thus, even on the nights Plaintiff was not on Defendants schedule to have a work shift, Plaintiff was nevertheless still required to be "on call" to work and would be fired in retaliation for same if she failed to show.

97.  Plaintiff was never reimbursed for any of her "on call" time.

98.  Plaintiff was, however, punished if she could not be on call.

**Defendants' Breach of Contract with Plaintiff**

99.  At the time of her hiring in 2017, Plaintiff was promised that she would receive a 5% commission on all reservations she booked at The Box.

100. However, Ms. DiMauro soon learned that this was not a way for her to earn extra income, but yet another requirement to work at The Box for which she would be denied promised compensation.

101. Specifically, Plaintiff and the other waitresses were "punished" by not being scheduled for the upcoming work period if they failed to book reservations.

102. Out of fear of being left off the schedule and unable to earn an income, Plaintiff worked hard on her off-hours and brought in over forty (40) clients to The Box.

103. However, in or around May 1, 2018, Defendant Vivas advised Plaintiff that Defendants would stop paying commissions altogether for reservations.

104. Defendants promised Plaintiff that she would continue to be paid for her reservations up until May 1, 2018. However, this promise was not kept.

105. Instead, sometime after May 2018, the Plaintiff received only one (1) single commission check for her reservations from September 2017 through December 2017.

106. The amount was incorrect, and did not represent the 5% promised to the Plaintiff at the time she accepted employment The Box.

107.    Unbelievably, Plaintiff never received any of her commissions for bookings she made between January 2018 and May 2018, in breach of the contractual terms set by Defendants to pay such commissions.

108.    Further, although Defendants stopped paying commissions for reservations, booking reservations remained a requirement if Plaintiff wanted to stay employed at The Box, which the Defendants made clear to Plaintiff and other waitresses in no uncertain terms through repeated e-mails and text messages.

109.    As recently as December 9, 2019, Defendant Vivas e-mailed Plaintiff and the other Box waitresses to advise them that if they wanted to remain employees of The Box, they needed to bring in New Year's Eve reservations.

110.    This obligation to get reservations required Plaintiff to spend unpaid hours every week reaching out to customers via her personal cell phone, e-mail address and social media accounts to try to get customers to make reservations.

111.    At all times relevant to this Complaint, Plaintiff was required by Defendants to show them "proof" that she was soliciting clients via text and e-mail, and that she was posting advertisements about the Box on her personal social media pages.

112.    In addition to receiving no compensation for being forced to market The Box, Plaintiff found the requirement that she provide Defendants access to her social media pages and personal communications devices to be highly invasive, distressing, and another example of the toxic  and hostile culture of working at The Box.

**Gender Discriminatory Tip Refunding**

113.    Defendants illegally denied Plaintiff and the other waitresses, all female, their earned tips, if the tips failed to meet certain onerous criteria established by the Defendants.

114.    Specifically, Defendants included on a customer's check a suggested 20% gratuity amount, which waitresses were required to remind guests of at all times.

115.    Plaintiff was constantly told by Defendant Vivas and other management of The Box that if patrons tipped above the 20% suggested gratuity, whether they wanted to

or not, and she did not get the tip approved by the night manager at the night manager's sole discretion, the tip would be automatically refunded in full to the patrons.

116.  This arbitrary practice afforded Defendants an opportunity to maintain favorable relations with patrons by encouraging them not to tip waitresses, denying substantial (and promised at the time of hiring) tip monies to the Plaintiff and other waitresses, and further targeting a group of all-female employees for discrimination.

117.  Notably, the onerous requirement to "remind" patrons of the 20% suggested gratuity was not placed on the predominantly-male bartenders and had no effect on the bartenders' tips.

118.  Further, in an effort to entice patrons to spend money at The Box but discourage tips to waitresses, Defendants note on their website "[a] 'show fee' in the amount of 20% of your food & beverage costs will be added to your bill. This Show Fee is NOT a gratuity & is not distributed to the service staff as a gratuity….Tipping is not required or expected." (See http://www.theboxnyc.com).

119.  Therefore, as a direct and proximate result of the actions of Defendants, Plaintiff was denied substantial tips she earned or should have earned during the relevant time period.

120.  On January 17, 2020, Plaintiff notified Defendants in writing that she was forced to end her employment with The Box.

121.  Plaintiff did so because the work environment at The Box, and the illegal violations that persisted which make up this Complaint, have objectively become so intolerable that a reasonable person in Plaintiff's position felt compelled to leave under the circumstances.

122.  At all times throughout the Complaint, Defendants failed to end/abate/remediate, as well as investigate, any of Plaintiff's claims.

123.  As a result of Defendants' conduct, Plaintiff has been forced to retain an attorney to protect her rights and assert her claims.

## COUNT I

### (Violation of 29 U.S.C. § 206 – The Fair Labor Standards Act)

124.  Plaintiff repeats, reiterates, and realleges each and every allegation set forth above with the same force and effect as if more fully set forth herein.

125.  Defendants did not give legally-required notice to employees that they would be paid a reduced wage because Defendants intended to use their tips to satisfy their minimum wage obligations (i.e., misappropriate "tip credits").

126.  Defendants further failed to otherwise inform the employees of the provisions of 29 U.S.C. § 203 (m), as required.

127.  Defendants unlawfully applied a tip credit to employees' wages and violated the federal minimum wage requirements of 29 U.S.C. § 206, because the Plaintiff's actual pay was below federal minimum wage.

128.  Defendants' failure to give proper notice and the subsequent violations of the federal minimum wage requirements were "willful" as the term is defined 29 U.S.C. § 255.

129.  These actions by Defendants persisted up to and including the time of Plaintiff's constructive termination in January 2020.

130.  As a direct and proximate result of the actions of Defendants, Plaintiff has suffered mental anguish, physical discomfort, pain and suffering, shame and embarrassment, emotional distress injuries, the physical manifestation of emotional distress injuries and/or physical injury. Furthermore, Plaintiff has suffered lost wages, a diminished ability to earn a living, and a diminished capacity to enjoy Plaintiff's life.  Plaintiff's damages have been experienced in the past, and they will continue into the future.

131.  Further, Plaintiff has been required to retain an attorney to assist Plaintiff in asserting Plaintiff's claims and protecting Plaintiff's rights.

## COUNT II

### (Violation of 29 U.S.C. § 206 – The Fair Labor Standards Act)

132.   Plaintiff repeats, reiterates, and realleges each and every allegation set forth above with the same force and effect as if set forth fully herein.

133.   29 U.S.C. § 203 (m) only allows employers to apply a tip credit if they require tip pooling.

134.   Defendants mandated tip sharing from the waitresses at The Box, rather than tip pooling by all employees receiving tips, because the tip sharing only flowed in ***one direction***.

135.   Because Defendants did not mandate tip pooling, Defendants unlawfully applied a tip credit to Plaintiff and similarly situated service employees and thereby violated the federal minimum wage requirements of 29 U.S.C. § 206.

136.   Defendants' unlawful application of a tip credit and subsequent violations of the federal minimum wage requirement were "willful" as the term is defined 29 U.S.C. § 255.

137.   These actions by Defendants persisted up to and including the time of Plaintiff's constructive termination in January 2020.

138.   As a direct and proximate result of the actions of Defendants, Plaintiff has suffered mental anguish, physical discomfort, pain and suffering, shame and embarrassment, emotional distress injuries, the physical manifestation of emotional distress injuries and/or physical injury.   Furthermore, Plaintiff has suffered lost wages, a diminished ability to earn a living, and a diminished capacity to enjoy Plaintiff's life.  Plaintiff's damages have been experienced in the past, and they will continue into the future.

139.   Further, Plaintiff has been required to retain an attorney to assist Plaintiff in asserting Plaintiff's claims and protecting Plaintiff's rights.

## COUNT III

**(Violation of 29 <u>U.S.C.</u> § 206 – The Fair Labor Standards Act)**

140. Plaintiff repeats, reiterates, and realleges each and every allegation set forth above with the same force and effect as if set forth fully herein.

141. On every day that Plaintiff worked, Plaintiff spent substantial time engaged in non-tipped work required by or directed by the Defendants.

142. Defendants unlawfully applied a tip credit to the non-tipped work for this period of time, and violated 29 <u>U.S.C.</u> § 206, by failing to pay the federal minimum wage.

143. Defendants' unlawful application of a tip credit and subsequent violations of the federal minimum wage requirement were "willful" as the term is defined 29 <u>U.S.C.</u> § 255.

144. These actions by Defendants persisted up to and including the time of Plaintiff's constructive termination in January 2020.

145. As a direct and proximate result of the actions of Defendants, Plaintiff has suffered mental anguish, physical discomfort, pain and suffering, shame and embarrassment, emotional distress injuries, the physical manifestation of emotional distress injuries and/or physical injury.  Furthermore, Plaintiff has suffered lost wages, a diminished ability to earn a living, and a diminished capacity to enjoy Plaintiff's life.  Plaintiff's damages have been experienced in the past, and they will continue into the future.

146. Further, Plaintiff has been required to retain an attorney to assist Plaintiff in asserting plaintiff's claims and protecting Plaintiff's rights.

## COUNT IV

**(NYCHRL § 8-107 – Unlawful Discriminatory Practices based on Sex and Gender in violation of the NYCHRL)**

147. Plaintiff repeats, reiterates, and realleges each and every allegation set forth above with the same force and effect as if set forth fully herein.

148. Plaintiff, a female, was forced under the illegal tip pooling scheme created and enforced by the Defendants to share her tips as a waitress/service employee with

18

doormen, hostesses, barbacks, busboys, coat check staff, bathroom attendants, kitchen personnel, and ushers. For most of the relevant timeframe, she was forced to also share her tips with bartenders, who did not pool their own tips for sharing.

149. All or most of the staff Plaintiff and other similarly situated waitresses/service employees were forced to share tips with were males, who were not required to share their own tips back, representing an inherently and invidiously discriminatory practice in The Box's tip pooling scheme.

150. When Plaintiff attempted to complain about the illegal tip pooling scheme, she was advised by Defendant Vivas that "if you don't like it you can leave" and to "go back to school" – which constitutes retaliation and threats of retaliation.

151. Defendants engaged in numerous acts of harassment, retaliation and/or discrimination in administration of the tip pooling scheme and in response to Plaintiff's complaints about the structure.

152. Further, Defendants developed an arbitrary "overtipping" policy which encouraged patrons to deny Plaintiff hard-earned tips when they rose above 20%. This practice was disproportionally applied to waitresses of The Box only, who were all female, while all or mostly male bartenders were allowed to keep their tips, no matter how high, without interference from the Defendants.

153. The discrimination resulted in the creation of a hostile work environment for the Plaintiff based on her sex, and resulted in her receiving reduced tips because she was female.

154. Title 8 of the New York City Human Rights Law, NYCHRL § 8-107, provides that it is an unlawful discriminatory practice for an employer to discriminate against a worker in compensation or in other terms, conditions or privileges of employment based on their actual or perceived gender.

155. The foregoing facts and circumstances demonstrate that Defendants have violated NYCHRL § 8-107, by treating Plaintiff in a disparate faction and discriminating against Plaintiff because of Plaintiff's female gender.

156. As a direct and proximate result of the actions of Defendants, Plaintiff has suffered mental anguish, physical discomfort, pain and suffering, shame and

embarrassment, emotional distress injuries, the physical manifestation of emotional distress injuries, and/or physical injury. Furthermore, Plaintiff has suffered lost wages, a diminished ability to earn a living, and a diminished capacity to enjoy Plaintiff's life.  Plaintiff's damages have been experienced in the past, and they will continue into the future.

157.    Further, Plaintiff has been required to retain an attorney to assist Plaintiff in asserting plaintiff's claims and protecting Plaintiff's rights.


## COUNT V

### (Violation of the New York Hospitality Wage Order, NYCRR 146 – 1.3)

158.    Plaintiff repeats, reiterates, and realleges each and every allegation set forth above with the same force and effect as if set forth fully herein.

159.    Pursuant to the New York Hospitality Wage Order, NYCRR 146 – 1.3, "[a] service employee shall receive a wage of least the hourly cash wage rate listed below, and credit for tips shall not exceed the hour credit rate listed below, provided that the weekly average of tips is at the hour tip threshold rate listed below and the total of tips received plus wages equals or exceeds the basis minimum hourly rate."

160.    NYCRR 146 -1.3 applies to "large employers" with more than eleven employees.

161.    The Box was a large employer at all times relevant to this Complaint under NYCRR 146 – 1.3.

162.    The Plaintiff was a "service employee" at all times relevant to this Complaint under NYCRR 146 - 1.3, due to her many additional job responsibilities beyond serving food and drink to patrons of The Box.

163.    At the time of her hire in September 2017, the minimum wage for service employees, such as Plaintiff, was $9.15 an hour, with a $1.85 per hour tip credit, pursuant to NYCRR 146 - 1.3.

164.    However, despite the legally-mandated minimum wage in the State of New York, Plaintiff was actually paid $8.75 an hour at the time of her hire and for the duration of 2017.

20

165. From December 31, 2017 through December 31, 2018, the minimum wage for service employees, such as Plaintiff, was $10.85 an hour, with a $2.15 per hour tip credit, pursuant to NYCRR 146 - 1.3.

166. However, despite the legally-mandated minimum wage in the State of New York, Plaintiff was actually paid $8.75 an hour during 2018.

167. From December 31, 2018 through December 31, 2019, the minimum wage for service employees, such as Plaintiff, was $12.50 an hour, with a $2.50 per hour tip credit, pursuant to NYCRR 146 - 1.3.

168. However, despite the legally-mandated minimum wage in the State of New York, Plaintiff was actually paid $8.75 an hour during 2019 until November 22, 2019.

169. Plaintiff's W-2 forms and pay stubs further demonstrate her improper wages during her employment.

170. The foregoing facts and circumstances demonstrate that Defendants have violated NYCRR 146 - 1.3, by failing to pay Plaintiff the proper minimum wage during her time working at The Box.

171. As a direct and proximate result of the actions of Defendants, Plaintiff has suffered lost wages, a diminished ability to earn a living, and a diminished capacity to enjoy Plaintiff's life.  Plaintiff's damages have been experienced in the past, and they will continue into the future.

172. Further, Plaintiff has been required to retain an attorney to assist Plaintiff in asserting plaintiff's claims and protecting Plaintiff's rights.


**COUNT VI**

**(Violation of the New York Hospitality Wage Order, NYCRR 146 – 1.8)**

173. Plaintiff repeats, reiterates, and realleges each and every allegation set forth above with the same force and effect as if set forth fully herein.

174. Pursuant to the New York Hospitality Wage Order, NYCRR 146 – 1.8, "when an employee purchases a required uniform, he or she shall be reimbursed by the employer for the total cost of the uniform no later than the next payday."

21

175. The Plaintiff, along with other similarly-situated waitresses, was expected to purchase her own costumes for work and don makeup for themed events, like "Nightwatch: The Box Beach Party," "Satan's Casino," Wild Wild Wednesday" and "Camp Beaverton."

176. The clothing and makeup required to be worn by waitresses changed frequently, depending on the theme of any given night's events.

177. Accordingly, Plaintiff has spent countless sums of money on clothing and makeup that was required by the Defendants to create a "look" which included exploiting an objectifying the Plaintiff and other waitresses.

178. Defendants did not reimburse Plaintiff for the clothing and makeup purchases they required to work at The Box, in violation of NYCRR 146 – 1.8.

179. As a direct and proximate result of the actions of Defendants, Plaintiff has suffered damages for money outlaid for purchase of required clothing and makeup, as well as time seeking these items.

180. Further, Plaintiff has been required to retain an attorney to assist Plaintiff in asserting plaintiff's claims and protecting Plaintiff's rights.

## COUNT VII

**(Violation of the New York Hospitality Wage Order, NYCRR 146 – 1.5)**

181. Plaintiff repeats, reiterates, and realleges each and every allegation set forth above with the same force and effect as if set forth fully herein.

182. Pursuant to the New York Hospitality Wage Order, NYCRR 146 – 1.5, "[a]n employee who by request or permission of the employer reports for duty on any day, whether or not assigned to actual work, shall be paid at the applicable wage rage: (1) for at least three hours on one shift, or the number of hours in the regularly scheduled shift, whichever is less."

183. In the case of Plaintiff, being "on call" as defined in NYCRR 146 -1.5 was not just a "request" or something she had "permission" to do. It was an employer ***mandate***, for which she would be punished if she did not comply.

184.   Defendants stated to Plaintiff that if "on call," she was required to immediately report to work at any point in the evening up until 12:00 a.m.

185.   Plaintiff was never reimbursed for any of her "on call" time. She was, however, punished if she could not be on call.

186.   Defendants did not pay Plaintiff the "applicable wage rate" for being on call during all times relevant to this Complaint, in violation of NYCRR 146 – 1.5.

187.   As a direct and proximate result of the actions of Defendants, Plaintiff has suffered lost wages, a diminished ability to earn a living, and a diminished capacity to enjoy Plaintiff's life.  Plaintiff's damages have been experienced in the past, and they will continue into the future.

188.   Further, Plaintiff has been required to retain an attorney to assist Plaintiff in asserting plaintiff's claims and protecting Plaintiff's rights.


### COUNT VIII

### (Violation of NYLL § 652 – The New York Labor Law)

189.   Plaintiff repeats, reiterates, and realleges each and every allegation set forth above with the same force and effect as if set forth fully herein.

190.   On every day that Plaintiff worked, Plaintiff spent more than 20% of her shift doing non-tipped work.

191.   Because so much of Plaintiff's required work was untipped labor, Defendants unlawfully applied a tip credit to the wages of Plaintiff in violation of 12 N.Y.C.R.R. § 146-2.2 and thereby violated NYLL § 652 by failing to pay minimum wage as required by the State of New York.

192.   These actions by Defendants persisted up to and including the time of Plaintiff's constructive termination in January 2020.

193.   As a direct and proximate result of the actions of Defendants, Plaintiff has suffered mental anguish, physical discomfort, pain and suffering, shame and embarrassment, emotional distress injuries, the physical manifestation of emotional distress injuries and/or physical injury.  Furthermore, Plaintiff has suffered lost wages, a diminished ability to earn a living, and a diminished capacity

to enjoy Plaintiff's life. Plaintiff's damages have been experienced in the past, and they will continue into the future.

194. Further, Plaintiff has been required to retain an attorney to assist Plaintiff in asserting plaintiff's claims and protecting Plaintiff's rights.

## COUNT IX

### (Violation of NYLL § 652 – The New York Labor Law)

195. Plaintiff repeats, reiterates, and realleges each and every allegation set forth above with the same force and effect as if set forth fully herein.

196.  Defendants did not give proper written notice as required by 12 N.Y.C.R.R. § 146-2.2 and therefore unlawfully applied a tip credit to employees' wages and violated state minimum wage requirements by paying under minimum wage as required by New York.

197. These actions by Defendants persisted up to and including the time of Plaintiff's constructive termination in January 2020.

198. As a direct and proximate result of the actions of Defendants, Plaintiff has suffered mental anguish, physical discomfort, pain and suffering, shame and embarrassment, emotional distress injuries, the physical manifestation of emotional distress injuries and/or physical injury. Furthermore, Plaintiff has suffered lost wages, a diminished ability to earn a living, and a diminished capacity to enjoy Plaintiff's life. Plaintiff's damages have been experienced in the past, and they will continue into the future.

199. Further, Plaintiff has been required to retain an attorney to assist Plaintiff in asserting plaintiff's claims and protecting Plaintiff's rights.

## COUNT X

### (Violation of NYLL §195(1) – The New York Labor Law)

200. Plaintiff repeats, reiterates, and realleges each and every allegation set forth above with the same force and effect as if more fully set forth herein.

201. Defendants failed to provide Plaintiff and other employees with written notice containing, *inter alia*, the name of the employer and any "doing business as" names used by the employer including Variety Worldwide, LLC and The Box, the physical address of the employer's main office or principal place of business, and a mailing address if different, and the telephone number of the employer.

202. These actions by Defendants persisted up to and including the time of Plaintiff's constructive termination in January 2020.

203. Defendants are liable to the Plaintiff for statutory damages, together with costs and attorneys' fees for such violations.

## COUNT XI

### (Violation of NYLL §195(3) – The New York Labor Law)

204. Plaintiff repeats, reiterates, and realleges each and every allegation set forth above with the same force and effect as if more fully set forth herein.

205. With each payment of wages, Defendants failed to provide Plaintiff with an accurate statement including, *inter alia*, the name of employer and any "doing business as" names including Variety Worldwide, LLC and the Box, used by the employer, address and phone number of such employer as required by NYLL 195(3).

206. These actions by Defendants persisted up to and including the time of Plaintiff's constructive termination in January 2020.

207. Defendants are liable to the Plaintiff for statutory damages, together with costs and attorneys' fees.

## COUNT XII

### (Violation of NYLL § 196-d – The New York Labor Law)

208. Plaintiff repeats, reiterates, and realleges each and every allegation set forth above with the same force and effect as if more fully set forth herein.

209. Defendants required Plaintiff to contribute a percentage of her tips to other employees that was not customary.

210.   The required contribution of Plaintiff's tips, which was based on gender, was egregious, excessive, and denied Plaintiff any opportunity to make a decent living wage.

211.   In short, Defendants required Plaintiff to contribute an unreasonable percentage of her tips to other employees.

212.   Defendants thereby violated Section 196-d of NYLL.

213.   These actions by Defendants persisted up to and including the time of Plaintiff's constructive termination in January 2020.

214.   As a direct and proximate result of the actions of Defendants, Plaintiff has suffered mental anguish, physical discomfort, pain and suffering, shame and embarrassment, emotional distress injuries, the physical manifestation of emotional distress injuries and/or physical injury.  Furthermore, Plaintiff has suffered lost wages, a diminished ability to earn a living, and a diminished capacity to enjoy Plaintiff's life.  Plaintiff's damages have been experienced in the past, and they will continue into the future.

215.   Further, Plaintiff has been required to retain an attorney to assist Plaintiff in asserting plaintiff's claims and protecting Plaintiff's rights.

## COUNT XIII

### (Violation of NYLL § 196-d – The New York Labor Law)

216.   Plaintiff repeats, reiterates, and realleges each and every allegation set forth above with the same force and effect as if set forth fully herein.

217.   Defendants required Plaintiff to give her tips to employees whose primary duties were non-tipped duties and were ineligible to receive tips through employer-mandated tip sharing.

218.   Defendants thereby violated Section 196-d of NYLL.

219.   These actions by Defendants persisted up to and including the time of Plaintiff's constructive termination in January 2020.

220.   As a direct and proximate result of the actions of Defendants, Plaintiff has suffered mental anguish, physical discomfort, pain and suffering, shame and

embarrassment, emotional distress injuries, the physical manifestation of emotional distress injuries and/or physical injury.  Furthermore, Plaintiff has suffered lost wages, a diminished ability to earn a living, and a diminished capacity to enjoy Plaintiff's life.  Plaintiff's damages have been experienced in the past, and they will continue into the future.

221.   Further, Plaintiff has been required to retain an attorney to assist Plaintiff in asserting plaintiff's claims and protecting Plaintiff's rights.


**COUNT XIV**

**(Violation of 26 U.S.C. § 7434 – Internal Revenue Code)**

222.   Plaintiff repeats, reiterates, and realleges each and every allegation set forth above with the same force and effect as if more fully set forth herein.

223.   189 Chrystie Partners, LP willfully filed fraudulent information on Plaintiff's W-2 forms by intentionally excluding cash tips from her income beginning from the time of Plaintiff's hire in September 2017.

224.   These actions by Defendants persisted up to and including the time of Plaintiff's constructive termination in January 2020.

225.   Plaintiff is entitled to actual damages sustained as a proximate result of the filing of the fraudulent information on her tax return including any costs attributable to resolving deficiencies as a result of such filing, the costs of the action, and reasonable attorneys' fees as awarded in the Court's discretion.

226.   Further, as a direct and proximate result of the actions of Defendants, Plaintiff has suffered mental anguish, physical discomfort, pain and suffering, shame and embarrassment, emotional distress injuries, the physical manifestation of emotional distress injuries and/or physical injury. Plaintiff's damages have been experienced in the past, and they will continue into the future.

227.   Further, Plaintiff has been required to retain an attorney to assist Plaintiff in asserting plaintiff's claims and protecting Plaintiff's rights.

## <u>COUNT XV</u>
### (Breach of the Implied Covenant of Good Faith and Fair Dealing)

228.   Plaintiff repeats, reiterates, and realleges each and every allegation set forth above with the same force and effect as if more fully set forth herein.

229.   Defendants had contractual obligations to Plaintiff as reflected above, including but not limited to promising Plaintiff she would receive 5% of reservations she booked, that she would receive legally correct tips, and that she would have an opportunity to work as a waitress/service employee in an environment that was not hostile, toxic, or violative of federal, state and local laws.

230.   Defendants have breached these obligations.

231.   Defendants have not dealt in good faith with Plaintiff by failing to ensure they were acting in compliance with local, state and federal laws.

232.   Defendants failed to act in good faith to investigate, end or abate the illegal practices exhibited by Defendants that Defendants knew or should have known of.

233.   Defendants' illegal conduct came from the top of management, thus making the corporate Defendants vicariously liable for Defendants' conduct and refusal to prevent, end or abate such conduct.

234.   Defendants' actions give rise to the claim of breach of the implied covenant of good faith and fair dealing.

235.   As a direct and proximate result of the actions of Defendants, Plaintiff has suffered mental anguish, physical discomfort, pain and suffering, shame and embarrassment, emotional distress injuries, the physical manifestation of emotional distress injuries and/or physical injury.  Furthermore, Plaintiff has suffered lost wages, a diminished ability to earn a living, and a diminished capacity to enjoy Plaintiff's life. Plaintiff's damages have been experienced in the past, and they will continue into the future.

236.   Further, Plaintiff has been required to retain an attorney to assist Plaintiff in asserting plaintiff's claims and protecting Plaintiff's rights.

## COUNT XVI
### (Breach of Contract)

237.   Plaintiff repeats, reiterates, and realleges each and every allegation set forth above with the same force and effect as if set forth fully herein.

238.   Defendants had contractual obligations to Plaintiff that were set forth in written contract, oral representations and/or their handbook and other employment documents.

239.   Defendants' actions breached the contractual obligations set forth in these documents.

240.   Defendants breached their contract by failing to ensure they were acting in compliance with local, state and federal laws.

241.   Defendants' actions give rise to the claim of breach of express and implied contract.

242.   As a direct and proximate result of the actions of Defendants, Plaintiff has suffered mental anguish, physical discomfort, pain and suffering, shame and embarrassment, emotional distress injuries, the physical manifestation of emotional distress injuries and/or physical injury.   Furthermore, Plaintiff has suffered lost wages, a diminished ability to earn a living, and a diminished capacity to enjoy Plaintiff's life.   Moreover, Plaintiff has and/or may have to incur expenses for medical, psychiatric, and/or psychological counseling and care.   Plaintiff's damages have been experienced in the past, and they will continue into the future.

243.   Further, Plaintiff has been required to retain an attorney to assist Plaintiff in asserting Plaintiff's claims and protecting Plaintiff's rights.

## COUNT XVII
### (Common Law Fraud in the Inducement)

244.   Plaintiff repeats, reiterates, and realleges each and every allegation set forth above with the same force and effect as if more fully set forth herein.

245.   Defendants made material misrepresentations of facts to Ms. DiMauro at the time of her hiring and throughout her employment, namely, that she would be compensated and receive a fair and equitable portion of her earned tips through

the Defendants' tip pooling structure, that Defendants would properly report Plaintiff's earnings to the IRS, and that Plaintiff would be compensated for the time she worked for Defendants.

246. The Plaintiff reasonably relied upon these misrepresentations.

247. In essence, Defendants "tricked" Plaintiff into working for free or for unfair wages while they redistributed her earned money to other employees, for their own purposes.

248. Most notably, in or around October 2019, Plaintiff learned that Defendants were changing the tip pooling scheme to include the coat check staff, bathroom attendants, kitchen personnel, and ushers within the waitresses' tip pool, along with doormen, hostesses, barbacks and busboys.

249. Even though this change removed bartenders (who received their own tips and were not required to pool them), the net effect of the October 2019 change was an ***even more unconscionable imbalance of tip pooling going in one direction*** from the Plaintiff to other Box employees, and ***even more of Plaintiff's hard-earned tips being taken away***.

250. Defendants never had any intention at all of providing fair and equitable compensation to Plaintiff.

251. Had Plaintiff known she would have been denied the fair and equitable compensation she was promised, she would have sought other employment.

252. As a result of the material misrepresentations of facts by Defendants, Plaintiff has suffered mental anguish, physical discomfort, pain and suffering, shame and embarrassment, emotional distress injuries, the physical manifestation of emotional distress injuries and/or physical injury.  Furthermore, Plaintiff has suffered lost wages, a diminished ability to earn a living, and a diminished capacity to enjoy Plaintiff's life.  Moreover, Plaintiff has and/or may have to incur expenses for medical, psychiatric, and/or psychological counseling and care.  Plaintiff's damages have been experienced in the past, and they will continue into the future.

## COUNT XVIII
### (Common Law Fraudulent Misrepresentation)

253. Plaintiff repeats, reiterates, and realleges each and every allegation set forth above with the same force and effect as if more fully set forth herein.

254. Defendants made material misrepresentations of facts to Ms. DiMauro at the time of her hiring and throughout her employment, namely, that she would be compensated and receive a fair and equitable portion of her earned tips through the Defendants' tip pooling structure, that Defendants would properly report Plaintiff's earnings to the IRS, and that Plaintiff would be compensated for the time she worked for Defendants.

255. The Plaintiff reasonably relied upon these misrepresentations.

256. Most notably, in or around October 2019, Plaintiff learned that Defendants were changing the tip pooling scheme to include the coat check staff, bathroom attendants, kitchen personnel, and ushers within the waitresses' tip pool, along with doormen, hostesses, barbacks and busboys.

257. Even though this change removed bartenders (who received their own tips and were not required to pool them), the net effect of the October 2019 change was an ***even more unconscionable imbalance of tip pooling going in one direction*** from the Plaintiff to other Box employees, and ***even more of Plaintiff's hard-earned tips being taken away***.

258. Defendants never had any intention at all of providing fair and equitable compensation to Plaintiff.

259. Had Plaintiff known she would have been denied the fair and equitable compensation she was promised, she would have sought other employment.

260. As a result of the material misrepresentations of facts by Defendants, Plaintiff has suffered mental anguish, physical discomfort, pain and suffering, shame and embarrassment, emotional distress injuries, the physical manifestation of emotional distress injuries and/or physical injury.  Furthermore, Plaintiff has suffered lost wages, a diminished ability to earn a living, and a diminished capacity to enjoy Plaintiff's life.  Moreover, Plaintiff has and/or may have to incur expenses

for medical, psychiatric, and/or psychological counseling and care.  Plaintiff's damages have been experienced in the past, and they will continue into the future.

## COUNT XIX
### (Constructive Termination)

261.   Plaintiff repeats, reiterates, and realleges each and every allegation set forth above with the same force and effect as if more fully set forth herein.

262.   Under New York Law, a constructive termination claim may be proven if a Plaintiff was "treated less well than other employees because of her membership in a protected class." Zick v. Waterfront Commission of New York Harbor, 2012 WL 4785703 at *8 (S.D.N.Y. Oct. 4. 2012) (internal citations omitted).

263.   New York Courts have also held that a constructive discharge occurs where "working environments have been made objectively so intolerable that a reasonable person" in Plaintiff's position would have felt "compelled to leave. Albania v. City of New York, 67 A.D.3d 407, 408 (NY. App. Div. 2009).

264.   In the present case, Plaintiff was treated less well as a waitress/service employee due to her female gender, subjected to a discriminatory practice of illegal tip sharing which favored all male or predominantly male employees of the box over the females from whom tips were being taken.

265.   Further, Plaintiff was subjected to unruly patrons,  compelled to do drugs and drink by Defendant Hammerstein, demeaned and demoralized by Defendant Vivas when she raised her concerns, and forced to objectify herself with costumes and makeup for the promise of tips and commission which never came. All of this treatment, including the continuous refusal of The Box's management to correct the Defendants' and their employees/servants/agents' conduct, created an "intolerable" workplace which the Plaintiff felt reasonably "compelled" to leave.

266.   In effect, Plaintiff was constructive terminated in January 2020.

267.   As a direct and proximate result of the actions of Defendants, Plaintiff has suffered lost wages, a diminished ability to earn a living, and a diminished capacity to enjoy Plaintiff's life.

268.   Furthermore, Plaintiff has suffered mental anguish, physical discomfort, pain and suffering, shame and embarrassment, emotional distress injuries, the physical manifestation of emotional distress injuries and/or physical injury. Plaintiff's damages have been experienced in the past, and they will continue into the future.

**WHEREFORE**, as to each and every count, Plaintiff demands judgment on each and all of these Counts against Defendants, jointly and severally, as follows:

A.   Compensatory damages;

B.   Unpaid wages, misappropriated tips, and liquidated damages under federal and state law;

C.   Damages for humiliation, mental and emotional distress;

D.   Statutory damages, if applicable;

E.   Punitive damages and or liquidated damages where permitted by law;

F.   Reasonable attorneys' fees and costs incurred by Plaintiffs in filing this action pursuant to 29 U.S.C. § 216(b), 26 U.S.C. § 7434(b) and NYLL §§ 198 and 663;

G.   Lawful interest – including pre-judgment interest on lost wages;

H.   Lawful interest – including pre-judgment interest on any wages not paid in a timely manner;

I.   Piercing the corporate veil of corporate entities as means of imposing liability on the dominating corporate entity as well as Defendants individually named; and

J.   Such other, further and different relief as the Court deems fitting, just and proper.

Plaintiff hereby reserves the right to amend this Complaint to supplement or modify the factual obligations and claims contained herein, based upon information received from the Defendants, witnesses, experts, and others in the course of discovery in this matter.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury of all issues so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure.

## DESIGNATION OF TRIAL COUNSEL

In accordance with the Federal Rules of Civil Procedure, JOHN J. ZIDZIUNAS, ESQ. is hereby designated as trial counsel on behalf of Plaintiff.

## CERTIFICATION OF NO OTHER ACTIONS OR PARTIES

I hereby certify that the matter in controversy is not the subject of any other action pending in any court or of a pending arbitration proceeding, that no other action or arbitration proceeding is contemplated, and that there are no other parties known to me at this time who should be joined as parties to this action.


DATED:        March 27, 2020


                              **JOHN J. ZIDZIUNAS & ASSOCIATES**
                              ***Attorneys for Plaintiff, Mariele DiMauro***


                              **By:      */s/ John J. Zidziunas*_____**
                                          **JOHN J. ZIDZIUNAS, ESQ.**
                                          **For the Firm**

34